In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00325-CV**
_____

**IN THE INTEREST OF S.C.**

**On Appeal from the County Court at Law**
**Orange County, Texas**
**Trial Cause No. C200555-D**

**MEMORANDUM OPINION**

Father (or "D.C.") appeals from the judgment of the trial court, which terminates both Father's and Mother's parental rights to "Sally," their child.[1,2] Father challenges: (1) the legal and factual sufficiency of the evidence to support a finding that he committed the predicate act under Texas Family Code section 161.001(b)(1)(Q); (2) the legal and factual sufficiency of the evidence to support

---

[1] We identify children and their family members in parental-rights termination cases by using an alias to protect the identity of the children. *See* Tex. R. App. P. 9.8(a), (b).

[2] Mother is not a party to this appeal.

1

that termination was in the child's best interest; (3) the trial court's conservatorship determination; and, (4) in four issues, asserts the trial court committed multiple errors denying him his due process rights and right to counsel. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q), (b)(2).

Additionally, J.S.G. and A.G. (collectively referred to as "Foster Parents"), filed a notice of appeal challenging the trial court's ruling striking their petition in intervention for lack of standing. Foster Parents argue the trial court erred by ruling they lacked standing to petition for termination and adoption under section 102.005(3) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 102.005(3) ("An original suit requesting only an adoption or for termination of the parent-child relationship joined with a petition for adoption may be filed by . . . an adult who has had actual possession and control of the child for not less than two months during the three-month period preceding the filing of the petition[.]").

We reverse the portion of the trial court's order terminating Father's rights and the trial court's order striking Foster Parents' petition in intervention and as to Father, remand the case for a new trial.

## I. Procedural Background

On September 22, 2020, the Texas Department of Family and Protective Services ("the Department") filed Trial Cause Number C200555-D, In the Interest of S.C., an Original Petition for Protection of a Child, For Conservatorship, and For

Termination in Suit Affecting the Parent-Child Relationship. In the suit, the Department named D.C. as the "alleged father." The Department sought termination of the parental rights of Mother and Father and appointment of the Department as sole managing conservator of Sally. A supporting affidavit stated that on June 17, 2020, Mother "was found lying in a ditch under the influence of methamphetamines or other substances[]" and that Mother "admitted to not knowing the location of her 1 year old daughter, [Sally.]" The affidavit further stated that a maternal aunt, K.J., located Sally at the home of an individual who was unaware of Sally's presence, and local law enforcement identified the residence as a concern due to suspected drug trafficking. According to the affidavit, Sally was released to K.J. The affidavit stated that Mother subsequently failed to provide a satisfactory sample for drug testing.

The supporting affidavit further averred that on June 21, 2020, an investigator contacted the alleged Father, who was incarcerated at the TDCJ Dalhart Unit. Father told the investigator the soonest he would be released was in April 2021, but his sentence would not expire until 2024. The affidavit noted: "[Father] stated he does not have any family members who Child Protective Services would approve of as caregivers because his grandmother is too old. He mentioned a younger brother but did not want to give out his personal information until he spoke to him first."

The supporting affidavit further indicated that Mother continued to use illegal drugs and on September 1, 2020, "admitted to relapsing on methamphetamines."

3

Due to her non-compliance with FBSS, on September 10, 2020, Mother and her boyfriend were court ordered to participate in services with the Department. The affidavit explained that while Sally was in the parental child safety placement with K.J., on September 17, 2020, she was found with a four-year-old at a flea market alone a quarter of a mile from the residence. Police transported the children to the police department. When Mother arrived at the police department, she had to be escorted from the building by law enforcement.

The affidavit also reveals the caseworker contacted another potential caregiver. While that caregiver initially took Sally into his care, on September 19, 2020, the replacement caregiver then advised the Department he could not continue to care for Sally but would do so until the Department could make other arrangements for her care. The affidavit stated that given the concerns about Mother's history of illicit drug use, previous child's prior history of being removed from her home, and her caregiver being unable to provide the continuity in care Sally really required, the Department was concerned for Sally's safety and well-being, and therefore, wanted the trial court to appoint the Department as Sally's temporary managing conservator.

On October 2, 2020, the trial court ordered genetic testing of the alleged Father and of the child. The parties were also ordered "to appear at the next scheduled Court hearing following completion of genetic testing[.]" Each of the trial

4

court's status hearing orders from October 2, 2020 to July 23, 2021 noted that D.C., the alleged Father, had not yet been served. That said, the Status Reports filed by the DFPS with the trial court during that time period indicate that D.C. as the "alleged Father" was aware of the proceeding and he was entitled to notice of the hearings, and the Department mailed D.C. a copy of the family service plan, and during the pendency of the case, D.C. had been in "frequent communication" with the caseworker.

Foster Parents filed an Original Petition in Intervention and for Termination of Parental Rights in Trial Cause Number C200555-D and on May 14, 2021, Foster Parents filed a Trial Brief in Support of Petition in Intervention and for Termination. Foster Parents alleged standing as adults who have had actual possession and control of the child for not less than two months during the three-month period preceding the filing of the petition. *See* Tex. Fam. Code Ann. § 102.005(3). The Department moved to strike and dismiss the plea in intervention. The Department argued that Foster Parents cannot maintain standing under section 102.005(3) because Section 102.003(a)(12) grants standing specifically to foster parents of a child placed in their care for at least twelve months ending not more than 90 days before the filing of the petition. *Compare* Tex. Fam. Code. Ann. § 102.005(3), *with* § 102.003(a)(12). The Department further argued that section 102.005 did not apply because the Department, not Foster Parents, had actual control of the child through a court-

ordered temporary managing conservatorship. The Department maintained Section 102.005 does not apply because the Department is seeking termination and conservatorship, not termination and adoption.

On March 4, 2021, the trial court held an initial permanency hearing, for review of conservatorship appointment and the placement of the child. The alleged Father, D.C., still had not been served and did not appear at the hearing. The trial court found at the hearing that D.C. "has demonstrated *minimal* compliance with the service plan."

The trial court heard Foster Parents' motion in intervention on May 14, 2021 in another case involving unrelated children removed from the same home, and the trial court noted that the hearing would be instructive in Sally's case as they involved identical issues. Foster Parents admitted that because they had the children for less than 12 months, they could not establish standing to file an original suit affecting the parent-child relationship under section 102.003(a)(12) of the Texas Family Code. They argued they established standing to file a suit for termination and adoption under section 102.005(3).

Subsequently, the trial court held a hearing regarding the children's placement following their removal from Foster Parents' home. The hearing took place over three separate days, May 24, 2021, June 9, 2021, and July 8, 2021. The trial court determined that Sally, who had since been placed with C.M. and S.M. (the

6

"Moores"), would remain in that placement. The trial court noted that Sally was doing well in that placement and would not impose another trauma on Sally by moving her again. Father did not attend these hearings, and nothing in the record indicates he received notice of these hearings.

On July 8, 2021, the trial court also signed an order striking the intervention and dismissing Foster Parents as parties to the case. Foster Parents sought mandamus relief in this Court. We denied the petition for a writ of mandamus. *See In re J.S.G. and A.G.*, No. 09-21-00252-CV, 2021 WL 4312983 (Tex. App.—Beaumont Sept. 23, 2021, orig. proceeding) (per curiam) (mem. op.).

The clerk's record reflects that on September 1, 2021, Father signed a waiver of service and general appearance. Trial commenced on September 2, 2021, where Father appeared for the first time, requested counsel, and counsel was appointed for him during the hearing.[3] Father testified that he completed the paperwork for a DNA test and wanted the test done. The Department explained that DNA testing had been ordered in October 2020, and the Attorney General's office erroneously scheduled it somewhere Father could not go to due to his incarceration, which the Department acknowledged was not his fault.

---

[3] On September 7, 2021, the trial court signed an order appointing an attorney for Father.

The trial date was then reset to September 9, 2021, and Father appeared with counsel. Father's attorney noted that Father would like to have an aunt considered as a potential caregiver, Father wrote a letter to her and would like a response to that. Accordingly, the parties agreed to reset the case for September 23, and the Department noted the dismissal date of September 27, 2021. The Department noted that they could not consider placement with an "alleged father," and there was a lengthy discussion about whether Father still wanted DNA testing or would agree to paternity, which would impact placement. At one point Father agreed to paternity but mentioned he felt "he didn't have a choice," so the trial court refused to adjudicate parentage without the DNA test.

On September 23, 2021, the case was called to trial, and Father appeared with counsel. The caseworker again explained that DNA testing was ordered some time ago, but that did not happen until very recently and they had not received the results but hoped to receive them by the week's end. The caseworker again testified this was not Father's fault nor due to lack of cooperation on his part. The caseworker testified that based on this, they were asking the Court to enter an interlocutory order with respect to Mother, then recess the hearing pending Father's DNA test results and return on October 14, 2021 to conclude the hearing, at which time the trial court could consider a possible extension. At the conclusion of the September 23 hearing, the trial court terminated Mother's rights, but given the pending DNA test results as

8

to Father, found that extraordinary circumstances warranted an extension of the September 27, 2021 dismissal date to March 25, 2022. The trial court also admonished Father that his parental and custodial rights were subject to restriction or termination unless he is willing to provide his child with a safe environment.

On October 6, 2021, the trial court adjudicated D.C. to be the father of Sally by genetic testing. On the same day, the trial court signed its Interlocutory Order of Termination of Parental Rights as to Mother. On October 6, 2021, the trial court also signed an order extending the dismissal date to March 25, 2022.

On October 14, 2021, the case was called for a continuation of the final hearing, but Father's counsel advised the court that Father had decided to sign an affidavit of voluntary relinquishment. Father's attorney further advised that he wanted to go over the affidavit with Father before he signed it. On October 14, 2021, Father signed the affidavit, which was filed with the trial court on October 18, 2021. On October 21, 2021, Father's attorney filed a rescission of Father's voluntary relinquishment. Even though Father signed the affidavit relinquishing his parental rights, the trial court allowed Father to rescind the affidavit after his attorney advised the trial court that his office had filed the affidavit with the court inadvertently. Father's attorney also advised the trial court that he had informed the Department Father was unwilling to proceed on the relinquishment ground. Following the announcement, the Department did not object to Father's request. And in its final

9

order, the trial court did not find that Father had voluntarily relinquished his parental rights to Sally. The trial court also advised the parties at the beginning of the October 21 hearing that it would proceed and consider Father's request to place Sally with his relative in the trial.

We note that Father also appeared with counsel during the portions of the trial where witnesses testified, which occurred on October 26, 2021. After hearing from the witnesses, the trial court terminated Father's rights finding by clear and convincing evidence he was incarcerated for the periods required by Texas Family Code section 161.001(b)(1)(Q) and found by clear and convincing evidence that terminating his parental right is in Sally's best interest.[4] Father and Foster Parents appealed.

## II. Evidence at Trial

### A. Testimony of CPS Caseworker Alexis Penning

During the final hearing, on September 23, 2021, the CPS caseworker assigned to the case, Alexis Penning, testified that Sally came into CPS care on June 17, 2020, when Mother was found lying in a ditch under the influence of methamphetamines. Penning explained that at the time, Mother admitted she did not know Sally's whereabouts. She testified that K.J., Sally's maternal aunt, located

---

[4] Having had their petition in intervention stricken, Foster Parents did not participate in the trial.

Sally in the home of an individual who did not know Sally was there, and local law enforcement indicated it was a "residence of concern due to suspected drug trafficking." Penning stated that "during this time, [Father] was incarcerated at the Dalhart Unit and it was expected he would be incarcerated until 2024."

According to Penning, as part of the Parental Child Safety Plan (PCSP) for Sally, she was placed in K.J.'s care; however, Sally was later found at the Vidor Flea Market with her four-year-old cousin, while both were unsupervised. Penning explained the children were taken to the Vidor Police Department where they remained for two hours before Mother and K.J. arrived, and Mother admitted to being under the influence, so the Department took Sally "into the care of the State."[5]

Penning testified that Sally was removed, placed in Foster Parents' care, and has been moved a couple of times. According to Penning, Sally experienced "a lot of anxiety in prior placements[]" and "in the prior placements she was having counseling done[.]"

Penning said Sally is currently placed with the Moores in Vidor, whom she referred to as "fictive kin." Penning testified the placement is "going very well[]" and Sally "loves her family very much there." When the trial occurred, Sally had been with the Moores for several months, and the family was meeting all Sally's

---

[5] Penning further explained that K.J. is doing well, her children were returned to her, and she maintains a relationship with the Moores so that her children and Sally can continue seeing one another.

11

needs. Penning indicated that it appeared to be a permanent placement, and the family would love to adopt Sally. She described the bond Sally has with her cousins and characterized it as a sibling attachment. Penning explained that the Moores ensure that Sally gets to see her cousins regularly. She felt Sally's current placement with the Moores remains in Sally's best interest, and it would be in Sally's best interest if they could eventually adopt her. Penning explained that Sally sees them as her family, loves them, and sees that as "her home." She also felt it would be in Sally's best interest to terminate Father's parental rights.

Penning explained she felt terminating Father's rights was in Sally's best interest, because Father is still incarcerated, and they do not know when he will be out of jail. She noted that Father has not been able to secure a bond with Sally, and "would go as far as saying that he really doesn't even know her. [Sally] doesn't know him either." Penning said that while she does not doubt Father loves Sally, she "is in a good, stable environment right now where she can have some contact with her family." Penning believed that if Father is paroled and begins making the right choices, the Moores would allow him to have contact with Sally.

Penning testified that Father had a Family Service Plan, which he completed. She confirmed Father had been incarcerated while the case was pending. Penning "can't say that [Father's] had a significant relationship with [Sally]. He's only contacted [Sally] through letters, which is what his ability would allow." During

Father's incarceration, Sally was left with Mother, who exposed her to danger through drug use and in locations where drug trafficking occurred. She confirmed that Father's actions placing him in prison and by not making proper arrangements for Sally's care with someone appropriate, Father placed her with persons who engaged in conduct that endangered her physical or emotional well-being. Penning explained that Father did not have regular visitation with Sally, and the only contact he had with her was through letters. According to Penning, Father had been unable to demonstrate he had the ability to provide Sally a safe place to live.

During Penning's testimony, records of Father's conviction and guilty plea to the third-degree felony of possession of a firearm by a felon were admitted as evidence. No one disputes his six-year sentence commenced on May 23, 2019. No one disputes he received credit for time served beginning March 9, 2018, which means Father will finish serving his sentence in prison in March 2024. But whether he will get out prior that that is a fact issue, as Penning testified Father was denied parole earlier in the year. Penning also confirmed Father has a lengthy criminal history, a history that includes multiple felonies, felonies on which he was sentenced to prison.

Penning testified about the efforts CPS made to work with Father on a family reunification plan. She explained that Father has known about Sally's case for some time, and that the Department was communicating with him about the case before

he was actually served. Penning confirmed that DNA testing had been requested, but due to scheduling mistakes by the AG's office, the Department learned only recently that Father is Sally's biological Father based on his DNA, results that it discovered just like Father only after the trial began.

Penning agreed that Father had possibly mentioned he had a relative who could possibly care for Sally, but the relative he mentioned to her was not the same person who was present for the trial. Penning explained that even should the court terminate Father's rights, the Department would nonetheless consider placing Sally with someone who is related to her.

On cross-examination, Penning testified that in prison, Father had the right to delegate his responsibility to care for Sally to his brother, if his brother could do so. Penning noted, however, that she did not recall seeing anything about Father's brother in Father's correspondence, and she questioned why Father was bringing delegating his rights to his brother up now. Penning explained that Father "got confirmation that he was the father two weeks ago, but I believe he testified in court that he didn't have any reason to believe he was not the father." Penning confirmed that Father had also provided the Department with the name of an aunt and conceded he was trying to make plans to take care of his child. Penning also testified that Father and Mother were drug users, and Father had a conviction in 2015 for

possessing a controlled substance. Penning did not know whether Father knew Mother was using drugs at the time he was incarcerated.[6]

Penning explained that Father told her in letters he believed so much at the beginning of the case that Sally was his child that he named her after his own mother. She further agreed that if a parent was that sure at the birth of the child and could not take care of the child because they were incarcerated, there would be an active effort for anybody in his family to try to get placement of Sally, which did not happen. Penning testified that the reason Sally was placed in Foster Parents' care with strangers was because Father failed to give the Department anybody that could take the child. Penning also agreed the Department would prefer to place with families over fictive kin. She agreed that the Department could look into the

---

[6] The evidence established that D.C. was sentenced for multiple criminal offenses between 2014 and 2020. The record reflects that D.C. had the following criminal convictions and probation violations:
• 2014: D.C. was convicted of evading detention with a vehicle and state jail felony theft;
• 2014: D.C. was convicted of possession of a controlled substance, a second-degree felony;
• 2015: D.C.'s probation was revoked, and he was sent to prison for six years;
• 2017: D.C. was released from prison and thereafter convicted of possession of a controlled substance, a state jail felony;
• 2019: D.C. was convicted of unlawful possession of a firearm by a felon, a third-degree felony; and
• March 2020: D.C. was convicted of DWI and possession of marijuana.

possibility of placing Sally with Father's family by a home study, but it would have to be approved.

**B. Testimony of Child's Caretaker, S.M.**

S.M., with whom Sally was placed at the time of trial, also testified. She described how Sally came to be in their care. She also described the bond Sally has with her cousins and the effort she goes through to maintain that contact. S.M. testified they "would love to adopt" Sally. S.M. also agreed they would be willing to accept managing conservatorship. She expressed her desire that Sally not be moved around anymore, they want what is best for her, and want her to have a relationship with Father. S.M. also agreed that if the court did not terminate Father's rights, she could provide a safe environment for Sally until he gets out. S.M. testified that Sally should have a relationship with Father "as long as he does what he's supposed to."

With respect to Father's family as placements, S.M. testified that Father told her that "he didn't have any family, that his grandmother was the only family he had, and that he felt alone in this world, that he didn't have anyone to turn to[.]" She again confirmed that in her recent discussions with Father, he maintained he did not have any other relatives, only his grandmother, who recently passed away. S.M. testified that Father never mentioned his brother.

She explained that Sally knows they are not her biological family but that they love her and will not let anything happen to her. Sally goes to daycare while S.M. and C.M. are at work, and S.M. explained she has friends there and a relationship with her teacher. S.M. testified she felt it was in Sally's best interest to stay with them and that "moving her would cause more damage." S.M. said she would love for Sally to know Father and for him to have something to do with his child.

## C. Testimony of Guardian Ad Litem

Dorothy Stanley, the guardian ad litem for Sally, testified at trial. Stanley has been involved in the case since Sally came into care. Stanley recommended terminating Father's parental rights to Sally.

When asked why she supported termination, Stanley explained that

> [Father] poses a future risk to the child because of his past conduct and incarceration. Also, I believe he's abandoned his child. He - - Not only does she carry the mother's name, she carries his last name, and I believe he knew full well that he had a child and that relatives could have c[o]me forward long before now.

Stanley testified she knew of no evidence that anyone came forward and was serious about placement of Sally.

Stanley testified that in making her recommendations to the court, she looked at the best interest of the child and future risks identified for the child in the placement along with her emotional wellbeing. Stanley said those factors for best interest included current and future emotional and physical needs of the child,

17

current and future emotional and physical danger, parental abilities, programs available to assist parents, plans for the child, stability of any proposed placement, parental acts or omissions that indicated it was not a proper relationship, and excuses for those acts or omissions.

Stanley testified that since Sally has been with the Moores, she "can see how [Sally] has grown; her speech has improved, she's happy, healthy, and the [Moores] love her wholeheartedly." Stanley confirmed that Sally had grown into a little girl who is happy and stable. As to a permanency plan for Sally, Stanley recommended termination of parental rights "in order for the [Moore] family to adopt [Sally] so she can maintain contact with established family members, which includes her aunt, her uncle, and their children[.]" Stanley testified those were people Sally knew before coming into care, and though not perfect, they are people who have followed her case, progress, communicated with the Department, and shown a desire to be in Sally's life.

## D. Testimony of Child's Maternal Aunt

Sally's maternal aunt, K.J., testified also. She described the close bond Sally had with her own children and confirmed Sally's placement with the Moores was a great opportunity for that bond to continue. She believed the Moores would continue to act in Sally's best interest. K.J. also believed the Moores would allow her to continue to have a relationship with Father even if his rights were terminated.

18

**E. Father's Testimony**

When the trial resumed on October 21, 2021, Father expressed his desire to rescind his affidavit of voluntary relinquishment. Father's attorney advised that his office had filed the affidavit inadvertently and prematurely, and the trial court agreed to accept Father's rescission and refused to allow the Department to rely on the affidavit of voluntary relinquishment.

Father testified that his projected release date is March 8, 2024. Father testified to the circumstances surrounding the offense for which he was incarcerated and confirmed the police found multiple loaded weapons in his vehicle. Father agreed he pled guilty because he was a convicted felon, knew he possessed those weapons, and knew he had broken the law. Father testified he knowingly and intentionally committed the crime.

During Father's testimony, photographs were admitted into evidence showing the firearms and other items found in Father's vehicle. Father admitted officers found a methamphetamine pipe in his storage facility and that he lied to officers, and he denied "using dope at the time." Father also testified there was marijuana in his vehicle at the time of his arrest and a metal container of marijuana in his storage facility. At the time of his arrest, police also found a loaded Ruger 22-caliber handgun, an AR-15 rifle, ammunition, handcuffs, and brass knuckles.

Father said he had been in a romantic relationship with Mother prior to Sally's birth. Father testified that he wrote a letter to the Department stating that he named Sally after his mother and that she has his last name. Father testified that he could not provide Sally with a safe and stable environment because of his choices leading to his incarceration. He expressed understanding that because of his and Mother's choices, Sally had been in the Department's care most of her life, had to move to several different homes, and it was traumatic to Sally every time she moved into a new home environment with strangers.

Father testified that

> I want it in black and white that when my daughter gets old enough and she wants to ask me that question, "Daddy, why didn't you fight for me," that I fought as hard as I could; I did everything in my power to fight for my child, because I want to be a father. I want to raise my daughter and my God-given right as a parent, I want every bit of it.

Father also testified that he wanted his brother to be considered as a possible placement. Father said he wanted to place Sally with his brother and sister-in-law and felt they could provide Sally with a safe environment. He testified that he last had contact with them at his grandmother's funeral in July, but they correspond. He agreed he understood he was asking that Sally be moved to another environment with strangers because of his and Mother's choices but Father still considered it to be in Sally's best interest.

Father testified that he wrote letters to Sally and loved her even though he was not 100% sure that she was his child. He explained he kept sending letters but received no response. Father testified that he felt he had "significant contact with the Department because that's what was asked of me, and I did as much as I could in the circumstances that I'm in." He said the Department told him what to do, and he did it. Father indicated he was willing to let the Court hold its decision in abeyance and have a home study done with his brother and sister-in-law. He felt that was the right thing since DNA had just confirmed his paternity, and he would be able to tell them the child was actually related to them. Father also indicated that his aunt, who he previously told the caseworker about, would be willing to help. Father testified he was never provided with a Child Resource Form. Father also believed he told the Department about his brother as a possible placement. Father explained that he wanted the trial court to know the effort he made while incarcerated, which included contacting the caseworker, his attorney, his aunt, his brother, and sending letters to CPS.

Father testified that based on the conversations he had with everyone, he believes that it is in Sally's best interest to be placed with family. He also testified that he felt like he would be denied due process if not given the opportunity to have his family considered as a possible placement for Sally.

Father testified that he believed when Mother was released from jail, she was doing well while she was pregnant, and he felt she was not engaging in conduct that would harm the child. However, Father also testified that he had asked someone to keep an eye on Mother and report any behavior that would not be in Sally's best interest.

Father testified he felt it would be in his child's best interest not to terminate his rights but transfer conservatorship to his brother instead. He agreed there were viable options for Sally that did not include termination. He believed he could provide Sally a safe environment with his brother.

## F. Testimony of Paternal Aunt, K.V.

K.V., the wife of Father's brother, testified at trial. K.V. confirmed that she had her first discussion with Father's attorney the afternoon before she testified. K.V. indicated they had "absolutely no idea[]" about the case prior to that conversation. She believed "absolutely 100 percent" they could provide a safe environment for Sally. K.V. testified that they did not know about the situation until the day before the hearing, she was "in shock" and "it was out of the blue." She explained that D.C. had never contacted them about being a possible placement for Sally and before hearing from D.C.'s attorney the day before, they believed Sally was with Mother, Mother "basically ran off with her, and [Father] had no idea where

22

she was." K.V. said they did not know where she was and if they had known sooner, they would have taken Sally into their home.

K.V. testified that she works as a nanny and is a Sunday school teacher. K.V. testified that if she could not bring Sally to work with her, she would take her to a daycare near their home; she had located a dentist, pediatrician, and other medical providers as part of her plan for Sally. K.V. testified that she and her husband have transportation and are both employed. She explained that her husband could not be at the hearing, because he was at work. She believed they had sufficient income to care for Sally, they are purchasing their own home and have never missed any payments.

K.V. testified they would not use corporal punishment but a reward system instead. When asked about Father being released from prison and seeing Sally, K.V. responded that "if he thinks that he can come back and we're just holding her for him, then that's not the case at all. We want to provide her a safe and loving environment with her family[.]" She explained that

> If he does straighten his act up of course he can get a lawyer and file for all that, but if he doesn't, I feel like he only has one chance to make this happen and really prove he can do this, and if he doesn't then we will just, you know, adopt her and let her be into this family.

K.V. testified that they do not have criminal records or a CPS history and indicated that they "don't party," drink, or smoke, and they would require Father to take drug tests before he had access to Sally. She testified that if Father gets out of prison and

23

does not do what he needs to for Sally, K.V. and her husband would be a long-term provider. K.V. explained that she is not in favor of terminating Father's rights now, but if he is released and does not do what he should, then she would be in favor of termination.

On cross-examination, the Department went through Father's lengthy list of criminal convictions, and K.V. confirmed her awareness of most of the convictions. When asked whether Father's past behavior would be a predictor of future behavior, she testified that "this is his test[,]" and if he takes "whatever classes he needs to get and then go on to getting a job, getting a house . . . then of course, . . . I feel like he could take care of her." She agreed that Father's behavior did not change despite multiple previous stays in jail. K.V. agreed that while it is important for Sally to have consistency and permanency, she felt "family should come first." She testified that Sally should be in one place, in K.V.'s home with her family yet did not know how many homes Sally had been in so far.

K.V. testified that before the hearing she knew Father was in prison and that he had a child, but she did not know where the child was. She explained they believed Mother had Sally, and they did not know her whereabouts, "or anything about her until yesterday." K.V. testified they had been communicating with Father through letters and saw him via "face-time" at their grandmother's funeral, but Father never mentioned that Sally was in Foster Parents' care or that CPS had

24

custody. Father never asked them prior to the day before the hearing if they would be willing to be a placement for Sally.

## G. Trial Court's Ruling

At the conclusion of the trial on October 21, 2021, the trial court found the Department met the predicate Q ground. The trial court explanation clearly shows the court was concerned about Sally having some stability in her life, given the instability she's faced based on the parenting she's had in the past. The trial court explained it this way:

> I do not find that the fact that the father called his brother and his wife yesterday to see about them possibly being willing to provide care for this child - - I don't find that to be an adequate plan. This child has been in care for over a year, and for him to be reaching out as late as yesterday to try to find a relative placement that would be willing to keep this child long term, I don't find that to be sufficient. I don't find that to be a good plan. I find he has not satisfied - - Well, I feel that [] the Department has satisfied the evidence - - with the evidence that he does not have the ability to provide care for his child, so that's - - And I also find that it's not in the child's best interest at this time to not have permanency, and I do find it's in the child's best interest to terminate the father's parental rights based on the Q grounds. I find not only that they met the ground, I find it's in the child's best interest.

The trial court noted that even though it was terminating Father's rights, the Department could still consider his brother's family for possible placement, and if they passed a home study, they could come back and decide at that time. The trial court appointed the Department as permanent managing conservator.

25

### III. Termination of Father's Parental Rights

Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief. *See Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). Thus, we address the rendition issues raised by appellant first, because if sustained the issues would provide greater relief than a remand. *See id.*

### A. Standard of Review

Father challenges the legal and factual sufficiency of the evidence to support the trial court's predicate Q finding and that termination was in Sally's best interest. The standard of proof required in cases involving termination of parental rights is clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

When conducting a legal sufficiency review of the termination of parental rights,

> a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a

court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802.

In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We defer to the factfinder's findings, and we cannot substitute our judgment for the factfinder's. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter of assessing the witnesses' credibility and demeanor. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

**B. Issue One: Legal Sufficiency to Support Predicate Finding Q**

Coupled with a best interest finding, a trial court may order termination of a parent's rights to a child if it finds by clear and convincing evidence that a parent has "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(Q). "Terminating parental rights under subsection Q requires that the parent be both incarcerated or confined *and* unable to care for the child for at least two years from the date the termination petition is filed." *In re H.R.M.*, 209 S.W.3d at 109–10 (emphasis original).

In *In re Caballero*, the Amarillo Court of Appeals interpreted Q as requiring a three-step process: (1) the party seeking termination must establish the parent's knowing criminal conduct resulted in incarceration for more than two years; (2) the parent must produce some evidence as to how he would arrange to provide care for the child during that period; and (3) the party seeking termination would then have the burden of persuasion that the arrangement would not satisfy the parent's duty. *See* 53 S.W.3d 391, 396 (Tex. App.—Amarillo 2001, pet. denied); *see also In re B.D.A.*, 546 S.W.3d 346, 358 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Father does not dispute that his knowing criminal conduct resulted in his conviction and incarceration for more than two years from the date of filing the

petition, rather he disputes the "inability to care for a child" element.[7] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *In re H.R.M.*, 209 S.W.3d at 109–10. Given that the two-year incarceration period is undisputed, we turn to whether Father produced some evidence as to how he would arrange care to provide for Sally during his incarceration. *See In re B.D.A.*, 546 S.W.3d at 358 (noting shifting burden and three-step process); *In re Caballero*, 53 S.W.3d at 396 (same). Father offered no evidence that he provided financial or other support for Sally during his incarceration. Instead, Father argues in his brief that "once Appellant identified a caregiver to provide a safe and stable home for Sally while he was in prison, the burden then fell on the Department to prove that the proposed placement was inappropriate." Father contends the Department failed to meet its burden because his sister-in-law testified that she and his brother would care for Sally during his incarceration.

Father cites to *In re J.G.S.*, 574 S.W.3d 101, 118 (Tex. App.—Houston [1st Dist.] 2019, pet. denied), to support this proposition. However, in *In re J.G.S.* the Houston Court of Appeals explained "that a parent relying on another's provision of care to avoid termination under Subsection (Q) must demonstrate that the care is being provided on behalf of the parent, not out of an existing duty or inclination to care for the child." *Id.* at 119 (citing *In re H.R.M.*, 209 S.W.3d at 105) (other citations

---

[7] The record established that the Department filed its petition to terminate Mother's and Father's parental rights on September 22, 2020. Father has been incarcerated since March of 2018, and he is scheduled for release in March of 2024.

omitted). Further, our sister court explained that an incarcerated parent does not meet his burden by merely producing evidence of an unincarcerated relative who is willing and able to care for the child, rather the parent must present evidence that the alternative caregiver is providing care on behalf of the parent. *See id.* (citations omitted). While there was some evidence that Father's brother and his wife agreed to care for Sally and may have been appropriate given their lack of criminal and CPS history coupled with their financial responsibility, Father must establish that they are doing so *on behalf of* Father, not out of their own, personal obligations to or desires for the child. *See id.* at 121; *see also In re H.R.M.*, 209 S.W.3d at 110; *In re D.D.*, No. 07-19-00392-CV, 2020 WL 830988, at *2 (Tex. App.—Amarillo Feb. 19, 2020, pet. denied) (mem. op.). Here, Father's sister-in-law testified that they would not permit Father to see Sally upon his release unless he satisfied certain requirements and would support termination if he failed to do so. This is no evidence that Father arranged for them to care for Sally on his behalf.

Further, Father argues that the Department failed to investigate whether the placement was appropriate. However, Father's sister-in-law testified that they were unaware of Sally's situation until the night before trial resumed on October 21, 2021. She further testified that although they knew Father had a child and communicated with him by writing letters, he did not ask them to care for Sally or apprise them of the situation. Despite his claims that he did not know for sure he was Sally's father

until the DNA test, Father testified that he had a romantic relationship with Mother, he named Sally after his own mother, she had his last name, and his sister-in-law testified that she was aware Father had this child. At one point, Father testified he had someone check on the child and Mother's well-being while in prison. Father was in contact with the Department during the case's pendency, there was evidence he communicated with his brother and sister-in-law regularly, yet they did not contact the Department about the care and welfare of Sally. Father was also present on September 2, 2021, when the case was first called to trial. While we concede (as we must) that Father did not have the DNA results until October 2021, he failed to ask his brother to care for Sally until October 20, 2021, even though there is evidence showing that he knew there was a good chance he was her father. *See In re D.L.A.*, No. 04-18-00182-CV, 2018 WL 4412506, at *10–11 (Tex. App.—San Antonio Sept. 18, 2018, pet. denied) (mem. op.) (concluding that where Father failed to posit a suggestion of an alternate caretaker until the trial 18 months after receiving the petition, the evidence was insufficient to show he arranged for another to assume his parental obligations while incarcerated); *Smith v. Dep't of Family & Protective Servs.*, No. 01-07-00648-CV, 2008 WL 2465795, at *5 (Tex. App.—Houston [1st Dist.] June 19, 2008, no pet.) (mem. op.). We conclude that Father failed to meet his burden of production to show that he arranged for another to care for Sally on his behalf during his incarceration.

Here, Father consistently communicated with the Department. He held a strong belief that Sally was his child, as did his relatives. The record shows that he made no serious effort to get the Department to place Sally with any of his relatives prior to the trial.[8] When he did raise his brother and sister-in-law as potential caretakers, he produced no evidence that they would be doing so on his behalf rather than as a personal obligation to or desire for the child. *See In re H.R.M.*, 209 S.W.3d at 110; *Interest of D.D.*, 2020 WL 830988, at *2; *In re J.G.S.*, 574 S.W.3d at 119.

Viewing the evidence in the light most favorable to the trial court's finding under subsection 161.001(b)(1)(Q), we conclude that the trial court could reasonably conclude and form a firm belief or conviction that D.C. knowingly engaged in criminal activity that resulted in his conviction of an offense, and confinement or imprisonment and inability to care for Sally for not less than two years from the date of filing the petition. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *In re H.R.M.*, 209 S.W.3d at 110; *In re N.R.T.*, 338 S.W.3d 667, 675–76 (Tex. App.—Amarillo, no pet.). We conclude the evidence was legally sufficient to support the trial court's predicate finding as to subsection Q and overrule Father's challenge to the legal sufficiency of the evidence supporting the predicate finding. Given our resolution of

---

[8] The affidavit of removal notes Father mentioned his brother as a possibility but did not want to provide his contact information until he spoke with his brother. His sister-in-law's testimony made clear that Father did not speak to them about it until the night before trial.

the due process claims below, we do not address his challenge to the factual sufficiency to support the predicate finding, as it would afford him no greater relief. *See* Tex. R. App. P. 47.1.

**C. Issue Two: Legal Sufficiency to Support Best Interest Finding**

Father next argues that the evidence was legally and factually insufficient to support the trial court's finding that termination was in Sally's best interest. The nonexclusive factors courts consider when determining the best interest of the child include:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see also* Tex. Fam. Code Ann. § 263.307(b). When conducting a best interest analysis, courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.) (citation omitted). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.* (citation omitted). The same

evidence proving acts or omissions under section 161.001(b)(1) may be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28 (citations omitted). There is a strong presumption the child's best interest is served by keeping the child with their natural parents, and the party seeking termination must rebut that presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

With respect to the best interest finding, the trial court heard testimony from the guardian ad litem and S.M. that Sally was doing well in her current placement and maintained contact with her maternal cousins, with whom she shared a sibling-like bond. The guardian ad litem testified she felt it would be in Sally's best interest to remain in her current placement and to terminate Father's parental rights. There was evidence that showed Sally considered the Moores to be her family and their home to be her home. The Department presented evidence that Sally was involved in showing animals and had established friendships in her current placement. The trial court also heard testimony regarding Father's lengthy criminal history involving drugs, theft, and firearm convictions. There was evidence that Sally had separation anxiety when she came into care, which had improved in her current placement. S.M. testified they would be happy to adopt Sally.

The trial court also heard the caseworker's testimony that Father did not have a significant relationship with Sally and that the actions leading to his incarceration endangered Sally's emotional well-being. The guardian ad litem also testified that

Father's actions put Sally at risk, and despite knowing he had a child, he failed to arrange for her care. During his testimony, Father acknowledged that his choices led to his incarceration and inability to provide Sally with a safe and stable environment. He further acknowledged that because of his choices and Mother's choices, Sally has been in the Department's care most of her life and had to be moved between several different foster homes, which was traumatic for her.[9]

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). As the sole judge of the credibility of the witnesses and the weight to be given their testimony, the trial court could reasonably conclude that termination of D.C.'s parental rights was in Sally's best interest. *See id.* §§ 161.001(b)(2), 263.307(a); *see also J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371–72 (outlining factors to consider in best interest determination). We conclude the evidence was legally sufficient to support the trial court's finding by clear and convincing evidence, that termination of D.C.'s parental rights is in Sally's best interest and overrule Father's

---

[9] In his brief, Father cites to our opinion in *In re B.C.H.* to support that termination is not in Sally's best interest. *See In re B.C.H.*, No. 09-18-00437-CV, 2019 WL 1940758 (Tex. App.—Beaumont May 2, 2019, no pet.) (mem. op.). We find that case inapposite. In that case, the ad litem testified that there was risk of significant psychological harm to the child if Mother's rights were terminated. *See id.* at *12. In this case, there is no such evidence regarding potential harm to the child if Father's rights are terminated, and the Department, the CASA, and the ad litem testified that termination of Father's rights would be in the best interest of the child.

challenge to the legal sufficiency of the evidence supporting the best interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Given our resolution of the due process claims below, we do not address Father's challenge to the factual sufficiency of the evidence supporting the best interest finding, as it would afford him no greater relief. *See* Tex. R. App. P. 47.1.

**D. Issues Three through Six: Right to Counsel and Due Process Violations**

In issues three through six, Father contends his due process rights were violated, because he was not allowed to meaningfully participate in multiple hearings, was not timely admonished about his right to counsel, and was not appointed counsel until September 2, 2021, the first day of trial. We agree.

**1. Law: Notice, Counsel, and Admonishment**

Before commencing a full adversary hearing, at each status hearing, and at each permanency hearing the court must inform any parent not represented by an attorney of the right to be represented by an attorney and if a parent is indigent and appears in opposition to the suit, the right to a court-appointed attorney. *See* Tex. Fam. Code Ann. §§ 262.201(a), (c), 263.0061. The trial court must appoint an attorney ad litem to represent the interests of an indigent parent who responds in opposition to a suit filed by a governmental entity in which the State requests termination of the parent-child relationship. *Id.* § 107.013(a)(1). "There appear to be no magic words that are required to be 'in opposition' to a request for termination."

*In re J.M.*, 361 S.W.3d 734, 738 (Tex. App.—Amarillo 2012, no pet.) (citation omitted). Section 107.013(d) requires that "[a] parent who claims indigence under Subsection (a) to file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court may conduct a hearing to determine the parent's indigence under this section." Tex. Fam. Code Ann. § 107.013(d); *see* Tex. R. Civ. P. 145(b) (describing requirements and contents of affidavit of indigency).

Section 107.013 contains no specific timetable for appointment of an attorney ad litem to represent the parent's interests. *See In re V.L.B.,* 445 S.W.3d 802, 807 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also In re M.J.M.L.,* 31 S.W.3d 347, 354 (Tex. App.—San Antonio 2000, pet. denied). Generally, a parent filing an affidavit of indigency triggers the trial court's duty to appoint an attorney ad litem for an indigent parent. *V.L.B.,* 445 S.W.3d at 805–06. However, a parent's failure to file an affidavit of indigence is not dispositive where the trial court has failed to admonish the parent of the right to counsel. *In re B.C.*, 592 S.W.3d 133, 136–37 (Tex. 2019) (noting a parent's "failure to file an affidavit of indigence is not dispositive because the trial court failed to properly admonish her as required by section 263.0061"). To hold otherwise would fault a parent for failing to invoke a procedure they were not even aware they had a right to exercise.

If a parent claims indigence and requests the appointment of an attorney at a status hearing or any permanency hearing held after the date the court renders temporary orders, the trial court shall require the parent to complete and file with the court an affidavit of indigence. Tex. Fam. Code Ann. § 263.0061(a), (b). With respect to the appointment of counsel and admonishments for parents, courts have reversed judgments when parents were not properly admonished or afforded counsel at key stages of the proceedings. *See, e.g., In re B.C.*, 592 S.W.3d at 137–38; *In re O.C.*, No. 09-20-00199-CV, 2021 WL 499062, at *1 (Tex. App.—Beaumont Feb. 11, 2021, no pet.) (mem. op.); *In re A.J.*, 559 S.W.3d 713 (Tex. App.—Tyler 2018, no pet.).

The Family Code also delineates the powers and duties of a parent's attorney ad litem. Tex. Fam. Code Ann. § 107.0131; *In re A.J.*, 559 S.W.3d at 718. An attorney ad litem representing a parent:

(1)  shall:
(A) . . . [W]ithin a reasonable time after the appointment, interview:

(i) the parent, unless the parent's location is unknown;
(ii) each person who has significant knowledge of the case; and
(iii) the parties to the suit;
(B) investigate the facts of the case;
(C) to ensure competent representation at hearings, mediations, pretrial matters, and the trial on the merits:
(i) obtain and review copies of all court files in the suit during the attorney ad litem's course of representation; and

38

(ii) when necessary, conduct formal discovery under the Texas Rules of Civil Procedure or the discovery control plan;

(D) take any action consistent with the parent's interests that the attorney ad litem considers necessary to expedite the proceedings;

(E) encourage settlement and the use of alternative forms of dispute resolution;

(F) review and sign, or decline to sign, a proposed or agreed order affecting the parent;

(G) meet before each court hearing with the parent, unless the court:

(i) finds at that hearing that the attorney ad litem has shown good cause why the attorney ad litem's compliance is not feasible; or

(ii) on a showing of good cause, authorizes the attorney ad litem to comply by conferring with the parent, as appropriate, by telephone or video conference;

(H) abide by the parent's objectives for representation;

(I) become familiar with the American Bar Association's standards of practice for attorneys who represent parents in abuse and neglect cases; and

(J) complete at least three hours of continuing legal education relating to representing parents in child protection cases as described by Subsection (b) as soon as practicable after the attorney ad litem is appointed, unless the court finds that the attorney ad litem has experience equivalent to that education; and

(2) is entitled to:

(A) request clarification from the court if the role of the attorney ad litem is ambiguous;

(B) request a hearing or trial on the merits;

(C) consent or refuse to consent to an interview of the parent by another attorney;

(D) receive a copy of each pleading or other paper filed with the court;

(E) receive notice of each hearing in the suit;

(F) participate in any case staffing conducted by the Department of Family and Protective Services in which the parent is invited to participate, including, as appropriate, a case staffing to develop a family plan of service, a family group conference, a

39

permanency conference, a mediation, a case staffing to plan for the discharge and return of the child to the parent, and any other case staffing that the department determines would be appropriate for the parent to attend, but excluding any internal department staffing or staffing between the department and the department's legal representative; and

(G) attend all legal proceedings in the suit.

Tex. Fam. Code Ann. § 107.0131(a). These duties are extensive and "commensurate with the seriousness of the rights at stake." *In re A.J.*, 559 S.W.3d at 719 (citing *In re V.L.B.*, 445 S.W.3d at 807.

### 2. *Eldridge* Analysis

The Fourteenth Amendment governs a state's attempted termination of the parent-child relationship. *See Santosky v. Kramer,* 455 U.S. 745, 753–54 (1982); *see also* U.S. CONST. amend XIV; Tex. Const. art. I, § 19. The Texas Supreme Court has recognized that the involuntary termination of parental rights "'involves fundamental constitutional rights.'" *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985) (citation omitted).

Our next question becomes what process is "due" before the attempted deprivation of parental rights. *In re R.M.T.*, 352 S.W.3d 12, 17 (Tex. App.—Texarkana 2011, no pet.). "At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *See id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)); *see also In re L.N.C.*, 573 S.W.3d 309, 322 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). The process

due in any given situation is measured by a flexible standard that depends on the practical requirements of the circumstances. *Eldridge*, 424 U.S. at 334; *Univ. of Tex. Med. Sch. at Hous. v. Than,* 901 S.W.2d 926, 930 (Tex. 1995). "When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky,* 455 U.S. at 753–54. "[T]he process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in *Eldridge*[.]" *Id.* at 754; *In re A.J.*, 559 S.W.3d at 719–20; *In re S.K.A.,* 236 S.W.3d 875, 892 (Tex. App.—Texarkana 2007, pet. denied). "[S]tatus as a prison inmate does not strip a person of his constitutional right of reasonable access to the courts." *In re A.J.*, 559 S.W.3d at 719 (citing *In re T.L.B.*, No. 07-07-0349-CV, 2008 WL 5245905, at *2 (Tex. App.—Amarillo Dec. 17, 2008, no pet.) (mem. op.)).

To assess what process D.C. was due, we weigh the three *Eldridge* factors enunciated by the United States Supreme Court in *Eldridge*: (1) the private interest affected by the proceeding or official action; (2) the countervailing governmental interest supporting use of the challenged proceeding; and (3) the risk of an erroneous deprivation of that interest due to the procedures used. *In re B.L.D.*, 113 S.W.3d 340, 352 (Tex. 2003) (citing *Eldridge*, 424 U.S. at 335). Courts must weigh these factors to determine whether the fundamental requirements of due process have been met by affording an "'opportunity to be heard' at a meaningful time and in a meaningful

manner[]" under the circumstances of the case. *See City of L.A. v. David*, 538 U.S. 715, 717 (2003) (quoting *Eldridge*, 424 U.S. at 333).

### a. Private Interests Affected by the Proceeding

Concerning the private interests affected, parental rights are "far more precious than any property right[,]" and the State's initiation of a termination proceeding "seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 758–59. A parent's interest in maintaining custody of and raising his or her child is paramount. *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Therefore, a parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one. *Id.*

We must also consider the private interests of the child. *See id.* "Both the parent and the child have a substantial interest in the accuracy and justice of a decision." *Id.* The considerations include D.C.'s fundamental liberty interest in maintaining custody and control of Sally, the risk of permanent loss of the parent-child relationship between them, and D.C.'s and Sally's interest in a just and accurate decision—weigh heavily in favor of providing D.C. with an attorney at a number of critical stages before commencement of the termination trial including prior to the adversary hearing, placement hearings, and permanency hearings, and an admonishment of his right to counsel at the statutorily mandated time. *See id.* at 548.

This factor also weighs heavily in providing Father notice and an opportunity to participate at critical stages of the proceeding.

### b. The State's Interest in the Proceeding

The State's interest in the proceeding includes protecting the best interest of the child, an interest which is "'served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home.'" *Id*. at 548–49 (citations omitted); *see also In re B.L.D.*, 113 S.W.3d at 353 (noting that the State's "interest in promoting the welfare of the child" aligns with the parent's interest in a just and accurate decision). The State has an additional interest in an accelerated timetable and a final decision that is not "unduly prolonged" with negative psychological effects on the child left in limbo. *See In re M.S.*, 115 S.W.3d at 548; *see also In re B.L.D.*, 113 S.W.3d at 353. "[T]he Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest." *In re M.S.*, 115 S.W.3d at 547 (citations omitted). Similar to their parents, children have an interest in a just and accurate resolution in termination cases. *See id.* at 548; *In re A.J.*, 559 S.W.3d at 720–21. Children also have a strong interest in a final termination decision so adoption to a stable home or return to the parents is not unduly prolonged. *In re M.S.*, 115 S.W.3d at 548; *In re A.J.*, 559 S.W.3d at 720–21.

The record shows that the Department was appointed as temporary managing conservator of Sally on October 2, 2020, during a full adversary hearing. The termination trial did not commence until September 2, 2021. Under the record before us, we conclude that advising Father of his statutory right to be represented by counsel before commencement of the trial at any number of points during the pendency of the proceeding would not have "unduly prolonged" the Family Code's statutory scheme for protecting the child's welfare. *See In re A.J.*, 559 S.W.3d at 721 (citation omitted).

### c. Risk of Erroneous Deprivation of Parent–Child Relationship

"The parent's, child's, and government's interest in a just and accurate decision dovetails with the third *Eldridge* factor—that of the risk of erroneous deprivation" of the parent-child relationship because of the followed procedure. *Id*. at 549; *In re A.J.*, 559 S.W.3d at 721; *In re R.M.T.*, 352 S.W.3d at 22. The Department contends Father was appointed an attorney when he requested one, that he made no suggestion that his counsel's representation was inadequate, and that his counsel did not seek a continuance. Even though Father was represented by counsel in the trial of the case, Father was without representation during the majority of the case, a twelve-month period between September 22, 2020 through September 9, 2021. On September 1 and September 7, 2021, the trial court issued Orders for D.C. as an inmate to appear via Zoom, and on September 7th the trial court appointed an

44

attorney ad litem to represent D.C. While the record before this Court does not indicate when the trial court first admonished D.C. of his right to appointed counsel, the record does show that alleged Father was not served, and therefore not admonished, for more than one year following the filing of the suit, despite his being named in the lawsuit as the alleged Father and the Department knew that where he was incarcerated. Thus, the trial court failed to admonish D.C. that he was entitled to be represented by counsel at all critical stages of the proceedings. *See In re A.J.*, 559 S.W.3d at 721. Under the third *Eldridge* factor, there was "a significant risk of erroneous deprivation of the parent-child relationship" between Father and Sally. *See id.* Balancing the *Eldridge* factors, we conclude Father was denied procedural due process, as he was denied a meaningful opportunity to participate in the proceedings until the time of trial.

### 3. *In re A.J.*

In the case of *In re A.J.*, the Tyler Court of Appeals reversed a termination on similar facts, concluding Father was denied procedural due process. *See id.* at 722. There, Father was incarcerated throughout the case and he was never statutorily admonished of his right to be represented by counsel or timely appointed counsel before trial. *See id.* at 719. The commencement of the trial began and at that time the indigent Father was not represented by an attorney. *Id.* After commencement of the trial, the trial court decided to reconvene after appointing an attorney to represent

the indigent Father. The trial was reconvened, and Father was represented by a court appointed attorney. The Department argued that Father failed to preserve this error because he failed to object to the timing of counsel's appointment. *See id.* The Tyler Court of Appeals pointed to *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993) and determined that the right to assistance of counsel in parental termination cases should not be deemed waived by inaction, and it must be expressly relinquished plainly, freely, and intelligently, sometimes in writing and always on the record. *See id.* at 717–18 (citing *Marin v. State*, 851 S.W.2d at 280). In reaching their decision, the Tyler Court noted Father "was also denied the right to appointed counsel, did not waive his right to counsel, and was effectively denied any method of meaningful participation at any of the critical stages of the case or at the beginning of the trial[]" and the Tyler court presumed under its facts that the denial was harmful error. *See id.* at 722.

### 4. Application and Harm

Here, the Department argues Father failed to preserve error on the "due process" issues. Generally, in cases involving the involuntary termination of parental rights, our rules of error preservation apply. *See In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d at 350–51; *see also* Tex. R. App. P. 33.1(a)(1) (noting that as a prerequisite to presenting a complaint on appeal, the record must show it was presented to the trial court). During trial, Father testified he believed his

due process rights would be violated if the Department failed to consider his placement request. Assuming without deciding this was insufficient to preserve error, we cannot agree with the Department's position. The Texas Supreme Court has explained that there are certain circumstances where failure to preserve "may very well rise to the level of a due process violation because 'a different calibration of the [] *Eldridge* factors could require a court of appeals to review an unpreserved complaint of error to ensure that our procedures comport with due process.'" *In re M.S.*, 115 S.W.3d at 546 (quoting *In re B.L.D.*, 56 S.W.3d at 210–12) (discussing failure to preserve legal sufficiency complaint in the context of ineffective assistance claim). We conclude this is one such situation. Based on our analysis of the *Eldridge* factors above, we determine that Father, at a minimum was entitled to notice, an opportunity to meaningfully participate in the proceedings prior to trial, and admonishments regarding his right to counsel. *See In re L.N.C.*, 573 S.W.3d at 322; *In re A.J.*, 559 S.W.3d at 720. The facts before us created a perfect storm that ensured Father was unaware of his rights, and even if he had been aware, did not have an opportunity to exercise them until the case was called to trial. "[E]rror preservation in the trial court, which is a threshold to appellate review, necessarily must be viewed through the due process prism." *In re M.S.*, 115 S.W.3d at 547.

Even if we do not presume harm, the record before us establishes harm. While the Order for Protection of a child in an Emergency and Notice of Hearing signed

47

on September 23, 2020, contained an admonishment about the right to counsel, nothing in the record indicates Father received this admonishment prior to signing the waiver of service on September 1, 2021.[10] The status hearing order did not contain an admonishment regarding counsel nor does the record indicate Father received notice of the hearing or the order. The record does not reflect that Father was served with notice of the initial permanency hearing or order dated March 5, 2021, and the Department's permanency report to the Court preceding that hearing indicated it knew of Father's location but had not served him even though the Department had changed the permanency goal from family reunification to termination. Similarly, the Department's permanency report to the Court on July 7, 2021 indicated Father was in frequent communication with the Department and noted his location but indicated he had not yet been served. The record does not reflect that Father was served with notice of the permanency hearing that took place on July 8, 2021 or the order dated July 23, 2021, which again indicates the Department's permanency goal of termination.

---

[10] The waiver of service Father signed acknowledged receipt of the original petition for protection of a child, affidavit in support of removal, order for protection of a child in an emergency, order appointing attorney ad litem, order appointing guardian ad litem, scheduling order, and an extra copy of waiver of service and general appearance. However, nothing indicates he received any of these documents prior to September 1, 2021, when he signed the Waiver of Service and General Appearance.

Father signed the waiver of service and general appearance before the appointment of and absent consultation with counsel. The very next day, on September 2, 2021, Father appeared at the first called final hearing, where the trial court admonished him of his right to counsel. He expressed his desire for counsel, and during the hearing, the trial court appointed counsel to represent him.[11] Thereafter, Father appeared with counsel for each final hearing date.

Further, the Department, despite knowing Father's identity and location and communicating with Father during the pendency of the suit, failed to serve him during the case's pendency for one year after it filed its original petition. The Family Code requires an admonishment of counsel before the initial adversary hearing and each subsequent hearing, but there is no indication Father received advanced notice of that hearing or any other hearing. There is also no indication he was ever admonished of his right to counsel despite letters he sent to the Department inquiring about the status of the case, questioning whether the Department was seeking to terminate his rights, and asking them not to do so. Because the Department failed to use reasonable diligence in having Father served with citation, it denied Father of his right to representation and to his right to meaningfully participate at the critical stages of the proceedings prior to trial. These critical stages included the status

---

[11] The trial court did not sign the order appointing counsel until September 7, 2021.

49

hearing, the adversary hearing, multiple placement hearings, and permanency hearings that occurred after the Foster Parents intervened.

Here, the trial court terminated Father's right under subsection Q, finding he was unable to arrange for substitute care for Sally during his incarceration. From the beginning of case the Department's claim that Father did not have the ability to care for Sally was a core issue in the case, as the affidavit of removal demonstrates in discussing potential placements for Sally. While the Department used one hand to fault Father for being incarcerated and being incapable of caring for Sally, with the other it presented testimony in the trial that it would not consider placing Sally with any members of Father's family until his parentage had been adjudicated. At trial, the Department told the trial court it "can't even consider a placement with an alleged father[]" when it hinged on the DNA results the Department failed to procure.[12] But the Department's logic is flawed, since it is the Department who is responsible for procuring the DNA test, when needed, to determine whether a putative father (or mother) is the biological parent of the child in the Department's custody. We find the Department's failure to diligently seek to have citation served upon Father and the trial court's failure to ensure such timely service, deprived

---

[12] Father testified during this hearing that he believed he was the father of Sally and that he was asking the Court to adjudicate him as Sally's father; however, he also said, "I don't have a choice[.]" After that, the trial court refused to adjudicate paternity. Father explained that he felt if he had had the DNA test administered sooner, he would have more time to "get ahold of [] family to get everything in line."

Father of his right to meaningfully participate at critical stages of the proceedings and to be represented by counsel to be harmful error.

Having concluded that Father was denied adequate notice, not permitted to meaningfully participate at critical stages during the case's pendency, the trial court failed to properly admonish him of his right to counsel, and that such due process violations resulted in harm, we sustain these issues. *See* Tex. R. App. P. 44.1(a)(1); *but see In re A.J.*, 559 S.W.3d at 722 (noting harmless error analysis was inappropriate and presuming a parent was prejudiced when denied right to appointed counsel and effectively denied any method of meaningful participation at any of the critical stages of the case).

## E. Issue Seven: Conservatorship

In his last issue, Father contends the trial court erred by appointing the Department as Sally's managing conservator and that there was "ample evidence" that appointing Father's brother and sister-in-law would be in Sally's best interest. Father further contends because there was no evidence to the contrary and argues for the application of Texas Family Code section 263.404. We disagree.

The Texas Supreme Court has determined that section 263.404 applies "only when the trial court *does not* order termination of the parent-child relationship[.]" *See In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007) (emphasis original). Because the trial court terminated Father's rights, section 263.404 does not apply. *See id.*

51

"[T]he quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment." *Id.* at 616. Circumstances could exist where the evidence is insufficient to support termination but still support the determination that appointment of a parent as conservator would impair the child's physical health or emotional development. *Id.* The level of proof is clear and convincing for terminations. *Id.* (citing Tex. Fam. Code Ann. § 161.001). However, the level of proof for conservatorship appointments is a preponderance-of-the-evidence standard. *Id.* (citing Tex. Fam. Code Ann. § 105.005) (other citation omitted). We review a trial court's decision on conservatorship for an abuse of discretion. *See id.*; *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982).

Here, we cannot say the trial court abused its discretion by appointing the Department as Sally's managing conservator. The record established that Sally's mother's rights had been terminated and Father was incarcerated. The evidence also established that Sally had no significant relationship with Father's brother or sister-in-law, and they had not been involved in the case prior to trial. To the extent Father contends the evidence was legally insufficient to support the trial court's conservatorship determination, we overrule this issue.

However, given our resolution of Father's due process issues and his inability to meaningfully participate at critical stages of the proceedings, which included placement and permanency hearings, and absence of counsel, on remand the trial

52

court should consider the conservatorship issue, including any potential placements offered by Father. *See* Tex. Fam. Code Ann. §§ 156.001 (permitting trial court to modify order), 263.002, 263.501 (requiring the trial court, when the Department is named a child's managing conservator, to hold a hearing to review the conservatorship appointment at least once every six months until the child becomes an adult); *see also In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *17 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.) (upon reversal of trial court's termination order, remanding for conservatorship determination, among other things).

## IV. Intervenors' Standing

Intervenors' sole issue is whether Foster Parents had standing under Section 102.005(3) to intervene with a petition for termination and adoption. Foster Parents testified that the Department placed Sally with them beginning in October 2020 through April 9, 2021. Foster Parents filed a petition in intervention on April 26, 2021. Because it is undisputed that the child resided with Foster Parents for not less than two months during the three-month period preceding the filing of the petition in intervention, unless Section 102.005(3) categorically excludes foster parents, Foster Parents could establish standing to request termination and adoption if they could show that they had actual possession and control of the children.

The Department argues the Legislature did not intend to convey standing to foster parents in section 102.005(3). "Standing, like other issues implicating a court's subject matter jurisdiction, is a question of law that we review de novo." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). "We analyze statutes 'as a cohesive, contextual whole, accepting that lawmaker-authors chose their words carefully, both in what they included and in what they excluded.'" *Id.* (quoting *Sommers v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017)). When we consider issues of statutory construction, "our objective is to determine and give effect to the Legislature's intent." *In re D.T.*, 625 S.W.3d 62, 71 (Tex. 2021) (evaluating Section 107.013 of the Family Code). "We ascertain that intent from the language the Legislature used in the statute." *Id.* "If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the statute." *Id.* "We read the statute as a whole, giving meaning to the language consistent with other provisions in the statute." *Id.*

The Department argues that foster-family specific amendments to sections 102.003 and 102.004 of the Family Code demonstrate the Legislature's intent to exclude foster parents from section 102.005(3). Traditional principles of statutory construction require a court to effectuate the Legislature's intent by giving effect to every word, clause and sentence. *Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021).

The Legislature enacted a statute that confers on certain persons general standing to file an original suit affecting the parent-child relationship ("SAPCR"). *See* Tex. Fam. Code Ann. § 102.003. The Legislature first conferred general standing to file a SAPCR on foster parents in 1997. Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 3, 1997 Tex. Gen. Laws 2012, 2012-13 (codified at Tex. Fam. Code § 102.003(a)(12)). Subsection 102.003(a)(12) allowed a SAPCR to be filed by a foster parent of a child placed by the Department in the person's home for at least 18 months (subsequently shortened to 12 months) ending not more than 90 days preceding the filing of the petition. In 1999, the Legislature amended the general standing statute to distinguish foster parents from other persons who have had actual care, control, and possession of a child. Act of May 30, 1999, 76th Leg., R.S., ch. 1390, § 2, 1999 Tex. Gen. Laws 4696, 4696-97 (codified at Tex. Fam. Code 102.003(a)(9), (12)). The Waco Court of Appeals interpreted subsections (9) and (12) to require a person to use time exclusive of time as a foster parent to establish they "'actual care, control, and possession of the child'" for six months under subsection (9). *In re Torres*, 614 S.W.3d 798, 803 (Tex. App.—Waco 2020, orig. proceeding). That construction gave effect to both subsections if 102.003(a), one that expressly conferred general standing to file a SAPCR on foster parents and one that expressly excluded them. *Id.* at 802–03.

In 2003, the Legislature amended the general standing statute codified at section 102.003 of the Family Code to add subsection (c), which provides:

> Notwithstanding the time requirements of Subsection (a)(12), a person who is the foster parent of a child may file a suit to adopt a child for whom the person is providing foster care at any time after the person has been approved to adopt the child. The standing to file suit under this subsection applies only to the adoption of a child who is eligible to be adopted.

Act of May 22, 2003, 78th Leg., R.S., ch. 573, § 1, 2003 Tex. Gen. Laws 1943 (codified at Tex. Fam. Code § 102.003(c)). Thus, a foster parent may file a suit to adopt their foster child any time after being approved to adopt a child who is eligible for adoption. *See id.* It should be noted that section (c) is not a specific standing section within the general standing to file suit under 102.003, but an exception to subsection (12). However, section (c) was not applicable to Foster Parents when they filed their petition for intervention, because at that time Foster Parents had not been approved to adopt the child nor was the child eligible to be adopted.

A separate section in Chapter 102 allows certain persons to file a suit for managing conservatorship and allows a trial court to grant leave to intervene to seek possessory or managing conservatorship in a pending SAPCR. *See* Tex. Fam. Code Ann. § 102.004. In 2017, the Legislature amended section 102.004 to limit the trial court's power to allow an intervention by a foster parent only if the foster parent meets the standing requirement to file an original suit under section 102.003(a)(12).

*See* Act of May 19, 2017, 85th Leg., R.S., ch. 341, § 1, 2017 Tex. Sess. Law Serv. 986 (codified in Tex. Fam. Code § 102.004(b), (b-1)).

In addition to the statute addressing general standing to file a SAPCR, in the 1995 recodification of the Texas Family Code, section 102.005 conferred on certain persons standing to petition specifically for adoption or for termination and adoption. *See* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws. 113, 125 (codified at Tex. Fam. Code § 102.005). The Legislature amended section 102.005 in 2007 to add standing for "an adult who has adopted, or is the foster parent of and has petitioned to adopt, a sibling of the child[.]" *See* Act of May 28, 2007, 80th Leg., R.S., ch. 1406, § 3, 2007 Tex. Gen. Laws 4814, 4815. The persons granted standing to petition for termination and adoption in the current version of section 102.005 include:

(1) a stepparent of the child;
(2) an adult who, as the result of a placement for adoption, has had actual possession and control of the child at any time during the 30-day period preceding the filing of the petition;
(3) an adult who has had actual possession and control of the child for not less than two months during the three-month period preceding the filing of the petition;
(4) an adult who has adopted, or is the foster parent of and has petitioned to adopt, a sibling of the child; or
(5) another adult whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so.

*See* Tex. Fam. Code. Ann. § 102.005. The Legislature addressed adoption placements and foster parents in some subsections of section 102.005, but the

Legislature neither limited subsection (3) to exclude foster parents nor made the other subsections exclusive means through which a foster parent could petition for termination and adoption.

In 2009 the Amarillo Court of Appeals held that foster parents could file a petition for termination and adoption under section 102.005(3) and that the foster parents did not lack the requisite control of the child by virtue of their status as a non-adoptive contract placement. *In re J.H.M.*, No. 07-07-0109-CV, 2009 WL 5174364, at *4 (Tex. App.—Amarillo Dec. 29, 2009, no pet.) (mem. op.). Since that case was decided the Legislature has amended section 102.005 to allow a foster parent of one child to petition to adopt the foster child's sibling but has not chosen to exclude foster parents from the standing provision of section 102.005(3).

Since a person's standing to intervene is generally commensurate with that person's right to file an original lawsuit, a party who has standing to file an original suit under Section 102.005 may also file an intervention under that same statute. *In re Y.J.*, No. 02-19-00235-CV, 2019 WL 6904728, at *5–6 (Tex. App.—Fort Worth Dec. 19, 2019, pet. denied) (mem. op.). Section 102.005(3) allows a person to seek termination and adoption if the person is an adult who has had actual possession and control of the child for not less than two months during the three-month period preceding the filing of the petition. Tex. Fam. Code Ann. § 102.005(3). A person's actual possession and control of a child refers to sharing a principal residence with

58

the child, providing for the child's daily physical and psychological needs, and exercising guidance, governance, and direction like that typically exercised on a day-to-day basis by parents with their children. *H.S.*, 550 S.W.3d at 160 (interpreting "actual care, control, and possession" in section 102.003(a)(9)).

We sustain Intervenors' sole issue. Because the appellants established standing to petition to adopt Sally, we hold the trial court erred by granting the Department's motion to strike and by dismissing the petition in intervention filed by J.S.G. and A.G.

## V. Conclusion

Having determined the trial court erroneously granted the Department's motion to strike and dismissed the petition in intervention, we reverse Paragraph 9 of the Order of Termination of Parental Rights. As to Father, we reverse Paragraph 7 of the Order of Termination of Parental Rights in trial court Cause No. C200555-D terminating D.C.'s parental rights to the child, and we remand the case for a new trial. As to Mother, the Order of Termination of Parental Rights is affirmed.

REVERSED AND REMANDED.

_____
CHARLES KREGER
Justice

Submitted on February 17, 2022
Opinion Delivered April 7, 2022

Before Kreger, Horton and Johnson, JJ.